# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Kathleen Bliss,

      Plaintiff

v.

CoreCivic, Inc.,

      Defendant

Case No.: 2:18-cv-01280-JAD-EJY

**Order Denying Motion
for Class Certification**

[ECF No. 228]

<span style="color:red">REDACTED for information contained in sealed exhibits;
unredacted version has been separately filed under seal.</span>

Criminal-defense attorney Kathleen Bliss sues corrections company CoreCivic, Inc., alleging that it recorded privileged calls between herself and her incarcerated clients at their facilities in violation of the Federal and Nevada Wiretap Acts.[1]  Bliss moves to certify a nationwide damages class of 2,444 attorneys who received tens of thousands of recorded calls from inmates at 20 different CoreCivic locations, as well as a statewide subclass of 282 attorneys who received such calls from their detainee clients at CoreCivic's facility in Pahrump, Nevada. Because I find that common questions don't predominate over the individualized consent and damages inquiries that this case, if certified, would require, I deny the motion.

## Procedural History

Bliss filed this action in 2018, and the following year I granted judgment for CoreCivic, finding Bliss's claims barred by both the Federal and Nevada Wiretap Acts' two-year statutes of limitations, which I found were triggered when she discovered the recording scheme.[2]  Bliss appealed, and the Ninth Circuit affirmed in part and reversed in part in a published opinion, holding that each recorded call triggered the statute of limitations anew, so any alleged wiretap-

---

[1] ECF No. 128 (second-amended complaint).

[2] ECF No. 93.

act violations prior to June 27, 2016, are time-barred, but subsequent ones aren't necessarily so.[3] Following remand, Bliss amended her complaint for a second time.[4]  CoreCivic moved to dismiss that second-amended complaint, but I denied the motion.  The parties conducted discovery, and Bliss now moves to certify two classes: (1) a nationwide class of attorneys who received recorded calls from detainees at 20 CoreCivic facilities throughout the country and (2) a statewide subclass of attorneys who received recorded calls from clients in CoreCivic's Nevada Southern Detention Center (NSDC).[5]

## Factual Background

CoreCivic is a private corrections and detention-management company with whom various governmental entities have contracted to operate correctional facilities throughout the country.[6]  Phone calls that detainees make from CoreCivic facilities are, for the most part, monitored or recorded (or are subject to monitoring and recording).[7]  CoreCivic facilities often include information about their call-recording practices in intake paperwork, handbooks, posters, and pre-recorded messages that play before outgoing calls.[8]  But they also generally provide a way for detainees to make confidential calls to their attorneys.[9]  The procedures for making a "properly placed" phone call to an attorney differ somewhat between facilities. █████████

---

[3] ECF No. 109; ECF No. 110.

[4] ECF No. 117; ECF No. 128.

[5] *See* ECF No. 228 at 9–13.

[6] ECF No. 228-3.  I redact portions of this decision that contain information found only in sealed exhibits.  *See* ECF No. 230 (order granting motion to seal); ECF No. 234 (same); ECF No. 237 (same).

[7] *E.g.*, ECF No. 228-26 at 15.

[8] *E.g.*, ECF No. 228-12 at 9; ECF No. 228-26 at 15; ECF No. 228-51; ECF No. 226-65.

[9] *E.g.*, ECF No. 228-26 at 15.

1  ███████████████████████████████████████████████████

2  ███████████████████████████

3         In 2016, Bliss learned that CoreCivic was recording what she believed to be attorney-

4  client-privileged conversations that she was having with clients confined at NSDC.[11] ████

5  ███████████████████████████████████████████████████

6  ███████  Bliss then filed this putative class action against CoreCivic for violations of the

7  Federal and Nevada Wiretap Acts.[13]  Having conducted discovery, she now seeks to certify:

8            a Rule 23 Class of: All attorneys who received at least one
          recorded "covered call" from a person confined in a CoreCivic

9            facility[; and]
          …

10

11            a Nevada Subclass of: All Rule 23 Class members who received at
          least one recorded "covered call" from a person confined at
          Nevada Southern Detention Center.[14]

12

13  A "covered call" is a call made by a detainee from any of 20 CoreCivic facilities to phone

14  numbers associated with attorneys in state-bar data or directories from all 50 states.[15]  "Covered

15  calls" only include those recorded and that exceeded specific durational limits that account for

16  call preambles and ring time.[16]  They are also limited by specific date ranges—starting in July

17

18  [10] *E.g.*, ECF No. 228-24 at 34.

19  [11] ECF No. 235-4 at ¶ 4.

   [12] *Id.*

20  [13] ECF No. 128.

21  [14] ECF No. 228 at 9–10.

   [15] *Id.* at 11; *see also* ECF No. 228-1 at ¶ 24.

22  [16] *See* ECF No. 228 at 11–12; *see also* ECF No. 228-89; ECF No. 228-93.  These durational
limits are specific to the various phone-service vendors CoreCivic uses at different facilities and

23  are meant to exclude calls that most likely didn't result in actual conversations or content being
recorded.  *See* ECF No. 228 at 11–12.

2016 and ending either when CoreCivic stopped service at a facility or on March 4, 2021, when, according to Bliss, "CoreCivic issued a more systematic and precise policy on attorney calls."[17] The end result of applying these date and durational limiters is a proposed class of approximately 2,444 attorneys who received 27,882 calls from inmates at 20 different CoreCivic facilities, as well as a proposed subclass of 282 attorneys who received 1,648 calls from detainees at NSDC.[18]

### Discussion

Before certifying a class under Federal Rule of Civil Procedure 23, a district court must conduct a "rigorous" analysis to determine whether a party has met the prerequisites for certification under Rule 23(a) and at least one of the class-certification requirements under Rule 23(b).[19]  Rule 23(a) contains four prerequisites for certification: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.[20]  The burden is on the plaintiff to "prove the facts necessary" to establish all four prerequisites "by a preponderance of the evidence."[21]

Although a certification determination under Rule 23 doesn't involve a direct analysis of the plaintiff's causes of action, "Rule 23 does not set forth a mere pleading standard."[22]  A plaintiff must prove "that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation" in order for a court

---

[17] ECF No. 228 at 11–12.

[18] *Id.* at 11–13; *see also* ECF No. 228-89.

[19] *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 456–66 (2013); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (citing Fed. R. Civ. P. 23).

[20] Fed. R. Civ. P. 23(a); *see also Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 613 (1997).

[21] *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022).

[22] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 351 n.6 (2011).

to grant certification.[23]  As this determination "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," the court may be required to "probe behind the pleadings before coming to rest on the certification question."[24]  So the "rigorous analysis" required under Rule 23 will frequently "entail overlap with the merits of the plaintiff's claim."[25]

In addition to meeting the requirements of Rule 23(a), a plaintiff must also satisfy one of the three subsections of Rule 23(b) to certify a class.  Bliss argues that certification in this case is warranted under Rule 23(b)(3),[26] which "requires a court to find that 'the questions of law or fact common to class members predominate over any questions affecting only individual members.'"[27]  "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."[28]  The same analytical principles applicable to Rule 23(a) govern Rule 23(b).[29]  "If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."[30]  It "is designed for situations in which class-action treatment is not as clearly called for,"[31] and it is "the court's

---

[23] *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart*, 564 U.S. at 350–51).

[24] *Wal-Mart*, 564 U.S. at 350–51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).

[25] *Id.*

[26] ECF No. 128 at 8; ECF No. 228 at 22–23, 34–37.

[27] *Comcast*, 569 U.S. at 33 (quoting Fed. R. Civ. P. 23(b)(3)).

[28] *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (quoting Fed. R. Civ. P. 23(b)(3)).

[29] *Comcast*, 569 U.S. at 34.

[30] *Id.* (citing *Amchem*, 521 U.S. at 623–24).

[31] *Id.* (quoting *Wal-Mart*, 564 U.S. at 362) (cleaned up).

duty to take a close look at whether common questions predominate over individual ones."[32] After performing this requisite "close look" I conclude that, even if the proposed class and subclass could meet the four requirements of Rule 23(a), Bliss fails to demonstrate that Rule 23(b)(3)'s predominance requirement is satisfied.

## I.   Consent analyses would require individualized inquiries because of the different recording disclosures and sources of information.

Consent is a complete defense to claims under the Federal and Nevada Wiretap Acts,[33] and "[d]efenses that must be litigated on an individual basis can defeat class certification."[34] "Consent may be express or may be implied in fact from 'surrounding circumstances indicating that the [party] knowingly agreed to the surveillance.'"[35]  It is the defendant's burden to submit evidence supporting the existence of a consent defense at the class-certification stage, and "[a] defendant can produce evidence of a predominance-defeating consent defense in a variety of ways."[36]

---

[32] *Id.* (quoting *Amchem*, 521 U.S. at 615) (cleaned up).

[33] 18 U.S.C. § 2511(2)(c), (d); NRS § 200.620.  One-party consent is sufficient under the federal act, which neither Bliss nor CoreCivic disputes.  18 U.S.C. § 2511(2)(c), (d).  The parties don't agree about whether the Nevada act requires two-party consent.  *See* ECF No. 228 at 27; ECF No. 231 at 47.  But I need not reach this issue because whether the attorneys receiving the "covered calls" and/or the inmates making them consented will both be relevant no matter which of the parties is correct.  I note, however, that it appears the Nevada Supreme Court has directly ruled on this topic.  *See Lane v. Allstate Ins. Co.*, 969 P.2d 938, 940 (1998) (interpreting NRS § 200.620 to require two-party consent).

[34] *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018) (citing *Wal-Mart*, 564 U.S. at 367).

[35] *United States v. Van Poyck*, 77 F.3d 285, 292 (9th Cir. 1996) (quoting *United States v. Amen*, 831 F.2d 373, 378 (2d Cir. 1987)).

[36] *See True Health*, 896 F.3d at 931–32; *see also Brown v. Google, LLC*, 2022 WL 17961497, at *17–18 (N.D. Cal. Dec. 12, 2022).

Bliss argues that consent must be actual and that only real—rather than hypothetical—issues of consent can defeat certification.[37]  And to the extent that CoreCivic is arguing "that consent exists because of its handbooks, posters, prerecorded messages, or the like," Bliss takes the position that "no individualized issues arise" because determining whether such disclosures constitute consent involves applying a reasonable-person standard, which "is not individualized."[38]  Bliss insists that these disclosures "are substantially similar if not identical" across CoreCivic's facilities during the covered time period, so a consent determination "can be made without inquiries of individual class members or the circumstances of prisoners' calls."[39]

CoreCivic counters that consent "is a highly individualized and fact-intensive inquiry."[40] It relies heavily on *In re Google Inc. Gmail Litigation*, in which the court found that individual issues of implied consent would "overwhelm any common questions."[41]  It contends that determining whether attorneys and inmates consented to the recording of "covered calls" requires examination of "the individual circumstances surrounding each call."[42]  This would, according to CoreCivic, necessarily involve separately examining—for each class facility, and sometimes for each individual inmate—the policies, procedures, and information provided about

---

[37] ECF No. 228 at 35–36.

[38] *Id.* at 36.

[39] *Id.* at 36–37; *see also* ECF No. 235 at 22.  Bliss also suggests at various points that she will argue that the places where these disclosures are found and how they were presented are generally inadequate and thus insufficient to give rise to implied consent.  *E.g.*, ECF No. 228 at 15–16.  But it seems unlikely that this case will turn on this implied-consent argument considering that the Ninth Circuit approved of these same types of notice for recording inmate calls in *Van Poyck*.  77 F.3d at 292.

[40] ECF No. 231 at 39–41.

[41] *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *18 (N.D. Cal. Mar. 18, 2014).

[42] ECF No. 231 at 41.

a particular facility's recording practices and how to place unrecorded attorney calls.[43]  These "myriad dissimilarities among" CoreCivic's facilities, it argues, render its consent defense incapable of classwide proof.[44]  It adds that a reasonable-person standard still requires examining whether a reasonable person would have consented under the specific circumstances of each covered call,[45] and it further contends that, unlike in many of the cases Bliss cites, there is evidence of actual consent here.[46]

Bliss includes a long string cite in support of her argument that only real, not hypothetical, issues can defeat certification.[47]  So the court would need some evidence of actual consent, either express or implied, for the consent defense to overcome predominance.  In *Campbell v. Facebook Inc.*, for example, the plaintiffs were challenging several practices that allegedly resulted in unlawful interceptions.[48]  Facebook argued that individualized implied-consent issues would predominate but it hadn't submitted any evidence that two of the challenged practices were ever actually "disclosed to Facebook users."[49]  The court noted that Facebook's implied-consent defense "could potentially raise individual issues" but that "[t]his dearth of evidence" left the court with "no basis to find" that some of the class members actually

---

[43] *Id.*

[44] *Id.* at 42.

[45] *Id.*

[46] *Id.* at 42–43.

[47] ECF No. 228 at 35–36.

[48] *Campbell v. Facebook Inc.*, 315 F.R.D. 250, 266–67 (N.D. Cal. 2016)

[49] *Id.* at 266.

consented to those two practices.[50]  So it concluded that "that individual issues of implied

consent" didn't predominate, at least as to those two specific practices.[51]

The *In re Google* court came to the opposite conclusion because Google had provided "a

panoply of sources from which email users could have learned of Google's interceptions."[52]

This included an information page that had "been viewed more than a million times," a link next

to each targeted advertisement that led to a disclosure, and various news articles discussing the

challenged practice.[53]  The fact-finder would therefore need "to evaluate to which of the various

sources each individual user had been exposed and whether each individual 'knew about and

consented to the interception' based on the sources to which she was exposed."[54]  The court

found that these "individual inquiries into the knowledge of individual users" would "overwhelm

any common questions."[55]

Like in *In re Google*, there is some evidence of actual consent in this case in the form of

disclosures made via handbooks, posters, intake paperwork, and prerecorded messages.[56]

Whether and to what extent these disclosures were effective (and in particular whether the

disclosures provided sufficient notice that *attorney-client communications* would be recorded if

certain procedures were not followed) is of course disputed.  And while the mere foreseeability

---

[50] *Id.* at 267.

[51] *Id.*

[52] *In re Google Inc.*, 2014 WL 1102660, at *17–18.

[53] *Id.* at *17.

[54] *Id.* at *18 (quoting *Berry v. Funk*, 146 F.3d 1003, 1011 (D.C. Cir. 1998)).

[55]

[56] ECF No. 228 at 35–36.

of monitoring is insufficient to constitute consent,[57] this dispute alone materially distinguishes the facts here from the "mere foreseeability" cases Bliss cites in which there was no advance notice that calls could or would be monitored or recorded.[58]

So I must examine the actual disclosures to determine if, as CoreCivic contends, consent analyses would vary across facilities and detainees[59] or, as Bliss argues, those disclosures "are substantially similar if not identical" rendering any inmate-end consent determinations capable of classwide proof.[60]  Though an objective, reasonable-person standard would ultimately be used to assess implied consent, this would still require looking at "surrounding circumstances indicating that the [party] knowingly agreed to the surveillance."[61]  In this case, at least on the client side of the "covered calls," the sources of information regarding recording policies are in large part controlled.  And identical or substantially similar disclosures across facilities during the periods in question could make the inmate-consent inquiry "particularly susceptible to class-wide adjudication."[62]

But a review of the prison handbooks reveals recording and attorney-client-call disclosures with material differences that would require individualized consent inquiries.  At one

---

[57] *Id.* at 35 (citing *United States v. Staves*, 383 F.3d 977, 981 (9th Cir. 2004), and *Steven Ades & Hart Woolery v. Omni Hotels Mgmt. Corp.*, 2014 WL 4627271, at *12 (C.D. Cal. Sept. 8, 2014)).

[58] *E.g.*, *Steven Ades*, 2014 WL 4627271, at *12 (finding no actual-consent issues "in the absence of any evidence of advance notice"); *Staves*, 383 F.3d at 981 (rejecting argument that "use of a cloned cellphone constitutes consent to its monitoring because monitoring is a foreseeable harm of using an illegal cellphone," and contrasting the facts of that case with the advance warnings of monitoring similar to those present here and deemed sufficient in *Van Poyck*, 77 F.3d at 292).

[59] ECF No. 231 at 41.

[60] ECF No. 228 at 36–37.

[61] *Van Poyck*, 77 F.3d at 292 (quoting *Amen*, 831 F.2d at 378).

[62] *See In re Google*, 2014 WL 1102660, at *15.

end of the spectrum lies 

---

[63] ECF No. 228-24 at 5.

[64] *Id.* at 34.

[65] *Id.* at 34–35.

[66] *Id.* at 35.

[67] ECF No. 228-26 at 3.

[68] *Id.* at 15.

1 ████████████████████████████████████████████████

2 ██████████████████████████████████████████████ ████

3 ████████████████████████████████████████████████

4 ███████████████████████████████████████

5      Other facility handbooks, however, provide vaguer or more limited information about the

6 potential recording of attorney-client communications and the procedures necessary to avoid

7 such recording.  One handbook notes only that ███████████████████████████████

8 ███████████████████████████████████████████████████████

9 █████████████████████ Another contains ███████████████████████

10 ██████████████████████████████████████████████

11 ██████████████████████ ███████████████████████████

12 ██████████████████████████████████████████

13 █████████ █████████████████████████████████████████

14 ███████████████████████████████████████████████

15 ██████████████████ ████████████████████████████

16 ███████████████████████████████ So the prison-handbook disclosures are

17 materially different because they provide varying levels of information about general call-

18 _____

19 [69] *Id.*

20 [70] *Id.* (emphasis added).
   [71] ECF No. 228-39 at 25 ████████████████████████████.

21 [72] ECF No. 228-42 at 28 ███████████████████████████.

22 [73] *Id.*
   [74] ECF No. 228-27 at 46 ████████████████████████████ (emphasis

23 removed).
   [75] *Id.*



1  recording procedures and, of particular relevance here, the necessary steps to make "properly

2  placed" attorney calls and whether calls will be recorded if those procedures are not followed.[76]

3         There are substantive differences in the intake paperwork used by the facilities at issue,

4  too. Some packets, for example, contain recording or monitoring consent forms for inmates to

5  sign that describe the special procedures for placing unmonitored attorney calls.[77] But other

6  facilities don't appear to require them to sign such forms and use intake paperwork that doesn't

7  mention call monitoring and recording at all.[78]

8         This all indicates that consent wouldn't be subject to classwide proof and would instead

9  need to be separately analyzed from facility to facility to determine whether using the phone

10  system without following whatever that facility's attorney-client call procedures were amounted

11  to implied consent to the interception. And in some cases, the consent analysis would require an

12  even more granular approach. Take, for example, ███████████████████████

13  ████████████████████████████████████████████

14  ███████████████████████████  Town hall meetings covered this topic during

15

16  _____

[76] Bliss characterizes "the notice and consent question" as "[d]id CoreCivic provide

17  inmates/detainees sufficient notice of the need to and method of privatizing attorney numbers?"
ECF No. 235 at 9.

18  [77] *E.g.*, ECF No. 228-12 at 9 ████████████████████████; ECF No. 228-14 at

19  5 ██████████.

[78] *E.g.*, ECF No. 228-13 ████████████████████████████; ECF No.

20  228-15 ██████████████████.

[79] ECF No. 228-30 to ECF No. 228-35.

21  [80] *Compare* ECF No. 228-30 at 21 ██████████████████████

22  ████████████████████████████████████████████

23  ██████████ *with* ECF No. 228-32 at 22 ████████████████████

████████████████████████████████████████████.

the relevant timeframe as well.[81]  So different consent analyses might be required for "covered calls" in different timeframes.  But what about a detainee who was at NDSC over the course of several different handbooks and other forms of disclosure?  Are new handbooks given to all inmates when one is issued, or are they just given to new arrivals?  And how might prior disclosures inform an inmate's understanding of this different or additional information?  These are just some of the questions relevant to a consent analysis that would need to be considered on a client-by-client or call-by-call basis.

There are individualized consent issues on the attorney end of the calls as well.  CoreCivic points out that Bliss received several "covered calls" on non-privatized numbers after learning that prior client calls had been recorded and of the need to privatize her numbers to prevent that from happening.[82]  Bliss counters that it was reasonable for her to believe that CoreCivic had stopped recording her calls,[83] and she can advance that argument in an effort to undermine its consent defense.  But this example demonstrates how an individual attorney's knowledge of recording and proper attorney-client call practices would factor into the consent analysis.  Part of that analysis would involve, as CoreCivic highlights, considering class members' individual exposure to similar litigation and related news articles[84] and whether exposure to those sources could give rise to implied consent.[85]  And while Bliss argues that the

---

[81] *See* ECF No. 228-46; ECF No. 228-47.

[82] ECF No. 231 at 42.

[83] ECF No. 235 at 22.

[84] ECF No. 231 at 41.  CoreCivic attached several such articles to its response.  ECF No. 231-22; ECF No. 231-23; ECF No. 231-24.

[85] *See In re Gmail*, 2014 WL 1102660, at *17 (whether class members learned "about the alleged interceptions from various media sources," examples of which had been submitted to the court, part of predominance analysis of consent defense and ultimate finding that "individual issues regarding consent [we]re likely to overwhelmingly predominate over common issues").

class period could be shortened to carve out the timeframe for specific articles CoreCivic submitted to address this,[86] these are not the only (or earliest) sources of information that would be relevant.[87]

In sum, there would be individualized inquiries required on both the client and attorney ends of the consent analysis, and consent is not a minor or trivial issue.  Rather, it is a complete defense and the parties, recognizing its import, have litigated it extensively throughout the life of this case.  Because of the number of facilities, detainees, and attorneys implicated by a national or statewide class, these individualized consent questions would overwhelm any common ones, precluding class certification.

## II.   Determining whether the "covered calls" were actually confidential attorney-client communications would also require extensive individualized inquiries.

Beyond the consent variances is the problem of confirming whether any given call was actually protected by the attorney-client privilege.  CoreCivic argues that there is no common proof that the 27,882 "covered calls" were true attorney-client privileged communications,[88] and determining whether they were would predominate over common questions.[89]  Bliss concedes that "the concept of privilege looms large in this case," but she contends that privilege is not "an element of any claim in this case, and technical privilege does not need to exist for the class

---

[86] ECF No. 235 at 22–23.

[87] *See, e.g.*, *United States v. Black*, 2017 WL 2151861, at *1 (D. Kan. May 17, 2017) (case in which CoreCivic's recording of attorney-client communications came to light in August 2016); *Johnson v. CoreCivic*, 2018 WL 7918162, at *2 (W.D. Mo. Sept. 18, 2018) (noting that a cease-and-desist order was issued for CoreCivic's recording of attorney-client communications in August 2016).

[88] ECF No. 231 at 31–33.

[89] *Id.* at 37–39.

claims or this case to hold together."[90]  Bliss takes the position that the datapoints relied on by

her data analyst, Alexander Wise, are sufficient to show that the "covered calls" more likely than

not had "contents"[91] and that actually listening to and analyzing these recordings is unnecessary

because "contents" is all that is required under the Federal Wiretap Act.[92]  For purposes of this

motion, I don't take issue with Wise's methodology as a way to assess class membership or

whether it is more likely than not that "covered calls" have some "contents."  But listening to the

"covered calls" and determining whether they contain confidential attorney-client

communications will, at minimum, be necessary to both fully assess CoreCivic's consent defense

and determine whether awarding statutory damages under the Federal Wiretap Act is warranted.

Analyzing whether calls were confidential attorney-client communications will be

necessary to determine whether individual class members can evade CoreCivic's consent

defense.  This is because *United States v. Van Poyck* establishes that general-recording notices

like those provided by the various CoreCivic facilities are sufficient to give rise to implied

consent for the recording of general, non-privileged detainee calls.[93]  The plaintiff in *Van Poyck*

brought a Wiretap Act claim when the prison where he was detained recorded calls in which he

made a number of "incriminating statements" and those recordings were later introduced in his

---

[90] ECF No. 235 at 10.

[91] *Id.* at 13.

[92] *Id.*; *see also* 18 U.S.C. § 2510(4).  The Nevada analog contains a similar requirement.  *See* NRS § 200.610(2) ("'Wire Communication' means the transmission of writing, signs, signals, pictures and sounds of all kinds . . . .").

[93] *See Van Poyck*, 77 F.3d at 292; *see also United States v. Faulkner*, 439 F.3d 1221, 1224 (10th Cir. 2006) (collecting cases) ("It is generally accepted that a prisoner who places a call from an institutional phone with knowledge that the call is subject to being recorded has impliedly consented to the recording.").

armed-robbery trial.[94]  But the court found he had "impliedly consented to the taping of his phone calls" because there were signs posted above the phones "warning of the monitoring and taping" and he was provided with a prison manual and consent form that discussed phone monitoring and recording procedures.[95]

While merely having some "contents" may be sufficient to establish Bliss's prima facie case, it's not be enough to avoid a finding of consent via application of *Van Poyck*.[96]  On this issue, Bliss may be satisfied with resting on call characteristics (i.e., their length and the fact that they were made to numbers associated with attorneys).  But CoreCivic has the burden to prove its consent defense, and it will almost certainly want to demonstrate that some (if not many) of these calls were not privileged communications such that individual inmates consented to their recording via the standard monitoring and recording disclosures that the *Van Poyck* court signed off on.  Indeed, CoreCivic has already argued that publicly available information suggests that multiple calls lacked a confidential, attorney-client nature.[97]

Consent is not the only issue that would require individualized scrutiny of each recording. Determining whether to award damages would also necessitate a customized review.[98]  Bliss

---

[94] *Van Poyck*, 77 F.3d at 287–88.

[95] *See id.* at 292.

[96] *See Evans v. Inmate Calling Sols.*, 2011 WL 7470336, at *19 (D. Nev. July 29, 2011) (noting that, in light of *Van Poyck*, "to prevail on their claims for violation of the [Federal Wiretapping] Act, plaintiffs . . . must show that the calls they believe defendants monitored were indeed legal calls, not simply personal or business conversations"), *report and recommendation adopted sub nom. Evans v. Skolnik*, 2012 WL 760902 (D. Nev. Mar. 7, 2012), *aff'd*, 637 F. App'x 285 (9th Cir. 2015).

[97] ECF No. 231 at 32.

[98] "[A] district court is not precluded from certifying a class even if the plaintiffs may have to prove individualized damages at trial . . . ." *Olean*, 31 F.4th at 669.  But this is "a conclusion implicitly based on the determination that such individualized issues do not predominate," *id.*, and the Ninth Circuit recently clarified that class certification is still "inappropriate when 'individualized questions . . . will overwhelm common ones." *See Bowerman v. Field Asset*

1  seeks statutory rather than actual damages,[99] but "statutory damages are not to be awarded

2  mechanically" under the Federal Wiretap Act.[100]  While the statute "essentially sets a statutory

3  floor for damages at $10,000" per violation, it "makes the decision of whether or not to award

4  damages subject to the court's discretion."[101]  Courts have considered numerous factors in

5  deciding whether to award statutory damages, including "the severity of the violation," "whether

6  or not there was actual damage to the plaintiff," "the extent of any intrusion into the plaintiff's

7  privacy," and "whether there is any useful purpose to be served by imposing the statutory

8  damages amount."[102]  And while some factors "can be analyzed in a manner common to the class

9  . . . other factors would warrant individualized analyses."[103]

10        Listening to each "covered call" to determine whether it contains confidential attorney-

11  client communications would be a requisite threshold inquiry performed as part of such an

12  analysis.  Bliss argues generally that "similar circumstances" and "common facts" distinguish

13  this case from *Campbell*,[104] in which the court found that individualized statutory-damages

14

15

---

16  *Servs., Inc.*, 60 F.4th 459, 469 (9th Cir. 2023) (quoting *Olean*, 31 F.4th at 669) (individual injury and damages issues defeated certification; noting that the "individualized mini-trials" required to assess damages and harm "plainly distinguish[ed]" that case from *Olean* where "the proposal for

17  calculating damages for each class member—though individualized—was 'straightforward'").

[99] ECF No. 228 at 26; *see also* ECF No. 235 at 23.

18
[100] *Campbell*, 315 F.R.D. at 268.

19  [101] *DirecTV, Inc. v. Huynh*, 2005 WL 5864467, at *8 (N.D. Cal. May 31, 2005), *aff'd*, 503 F.3d 847 (9th Cir. 2007); *see also* 18 U.S.C. § 2520(c)(2) (emphasis added) ("[T]he court *may* assess

20  as damages whichever is the greater of (A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or (B) statutory

21  damages of whichever is the greater of $100 a day for each day of violation or $10,000.").

[102] *Campbell*, 315 F.R.D. at 268 (citing *Huynh*, 2005 WL 5864467, at *8; *Dish Network LLC v.
22  *Gonzalez*, 2013 WL 2991040, at *8 (E.D. Cal. June 14, 2013)).

23  [103] *Id.*

[104] *See* ECF No. 235 at 23.

inquiries defeated class certification of the plaintiffs' Wiretap Act claims.[105]  The Federal

Wiretap Act claims in *Campbell* revolved around Facebook's handling and alleged scanning of

private messages.[106]  The court found that individualized statutory damages issues "would

predominate over common ones" because weighing the relevant factors would require

"individualized inquires" that would vary across class members.[107]  The court noted, for

example, that the "severity of the violation" or the "extent of any intrusion into the plaintiff's

privacy" would depend on class-member-specific facts.[108]  And whether a class member actually

suffered damage "would vary between class members," too.[109]

       Bliss's effort to distinguish this case from *Campbell* fails because the factors that the

*Campbell* court focused on would likewise require individualized analyses here.  Call-specific

issues like what was discussed on the call, who (if anyone) actually listened to the recording,

whether the recordings were provided to the government, and if and how the government used

the recordings would inform analyses of the severity of the violation, the extent of the privacy

intrusion, and whether an attorney-plaintiff suffered any actual damages stemming from

CoreCivic's recording of that specific call.  And like in *Campbell*, many individual damages

awards would likely be disproportionate in this case, and sorting those out would also "require

individualized analyses that would predominate over common ones."[110]

---

[105] *Campbell*, 315 F.R.D. at 268.

[106] *Id.* at 255–56.

[107] *Id.* at 268–69.

[108] *Id.* at 268.

[109] *Id.*

[110] *Id.* at 269.  None of the potential plaintiffs here are actual clients and holders of attorney-client privilege, so the harm they suffered is unclear.

Bliss insists that these individualized damages issues could be addressed by certifying a liability-only class, utilizing a claims process, "or bifurcating liability and damages for trial."[111] But even if I certified a class for liability purposes only, each individual "covered call" would still need to be examined as part of the consent analyses. Bifurcation would only further complicate this case as it would require analyzing the contents of the "covered calls" at multiple stages of the litigation. The claims-process option that Bliss proposes is likewise unworkable.[112] She cites to *Krakauer v. Dish Network, L.L.C.*, in which the claims process was focused on confirming whether individuals actually received unlawful telephone solicitations and were thus class members.[113] The *Krakauer* court, as its solution, decided to have the parties "submit undisputed claims" for judgment and that it would "develop a 'reasonable summary procedure' for resolving" disputed claims.[114] But it is likely that CoreCivic would dispute whether damages should be awarded for most, if not all, of the 27,882 "covered calls" at issue. And the analysis required to determine whether to award statutory damages is more complex than simply assessing class membership and thus could not be accomplished by a "reasonable summary procedure."

Examining the content of these 27,882 "covered calls" and determining whether the recordings do indeed contain confidential attorney-client communications would therefore be necessary to perform consent and damages analyses, which go to the heart of this case. My findings here are consistent with those of the district court in *Medina v. County of Riverside*,

---

[111] ECF No. 235 at 23.

[112] *Id.* (citing *Krakauer v. Dish Network, L.L.C.*, 2017 WL 11684747, at *1 (M.D.N.C. Nov. 3, 2017)).

[113] *Krakauer*, 2017 WL 11684747, at *1.

[114] *Id.*

which the Ninth Circuit affirmed in an unpublished opinion.[115]  *Medina* was a putative class

action brought by inmates and their attorneys alleging Federal Wiretap Act violations based on

the recording of attorney-client conversations.[116]  The *Medina* court likewise denied class

certification, finding that individual questions like "[w]hether an inmate-attorney phone call was

an attorney-client privileged communication," "whether that particular plaintiff waived the

privilege under several theories," and "whether the plaintiff consented to the conversation being

recorded" would predominate over common questions.[117]

Analyzing all of the "covered calls" here would be a huge undertaking given the number

of calls at issue.  Plus the sheer magnitude of this task would be further complicated by privilege

and waiver issues because many of the "covered calls" are likely privileged, and all of the

potential plaintiffs in this action are attorneys who do not hold, and thus cannot waive, that

privilege.  So individualized consent and damages inquiries related to the content and attorney-

client nature of these recordings would likewise predominate over any common questions.

## Conclusion

IT IS THEREFORE ORDERED that the motion for class certification **[ECF No. 228] is**

**DENIED.**

_____
U.S. District Judge Jennifer A. Dorsey
January 16, 2024

---

[115] *Medina v. Riverside Cnty. of,* 2007 WL 9717336, at *3 (C.D. Cal. May 16, 2007), *aff'd sub nom. Medina v. Cnty. of Riverside*, 308 F. App'x 118 (9th Cir. 2009).

[116] *Id.* at *1.

[117] *Id.* at *3.